U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2007 NOV -8 PM 12: 48

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

BY_____
DEPUTY CLERK

PAMELA GREEN, Plaintiff

        v.

EDWIN W. WEBSTER, (In His Individual
Capacity), Defendants

Case No.   1:06-cv-96

## PLAINTIFF'S STATEMENT OF MATERIAL FACT
## OPPOSING THE STATEMENT PROFFERED BY DEFENDANT AND
## OPPOSING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## (THE SUPPORTING DOCUMENTATION IS IN A SEPARATE COMPENDIUM)

The Plaintiff, Pamela Green, by her Counsel, David Putter, Esquire, pursuant to

Fed.R.Civ.Pro 56 and L.R. 71.(c)(2) , hereby asserts the following facts, with referenced

portions of the record attached, to oppose Defendant's Motion For Summary Judgment.

## THE RECORD TO WHICH WE CITE

This Statement contains citations to various documents including the Answer ( meaninng

the Amended of the Defendant dated October 5, 2006), Defendant's response to some Requests

To Admit, the transcripts of the depositions of the Defendant, of five other police officer

witnesses, and of Plaintiff, deposition exhibits and some additional documents which are not

deposition exhibits.   The amended answer and the complaint  are already in the court's file.

      Please note that we submit all the remaining cited supporting documents in the separate

compendium: "Documents Supporting Plaintiffs Statement of Material Fact Opposing The

Statement Proffered By Defendant And Opposing Defendant's Motion For Summary Judgment".

"Attachment A" is Excerpts from the transcript of  Defendant's Deposition [01/10/07].

Cited Excerpts from the depositions of five other police officer witnesses are as follows:

Attachment B: Christiensen, Morrisville Police Officer Garth  [11/16/06].

Attachment C: Dougherty, Stowe Police Officer Michael  [11/02/06].

Attachment D: Kaplan, Stowe Police Chief Kenneth  [11/16/06].

Attachment E: Larabee, Topnotch Security Person  Richard  [11/02/06].

Attachment F: Stewart, Stowe Police Detective Sgt Edward  [11/02/06].

"Attachment G" is Excerpts from the transcript of the Deposition of the Plaintiff.

"Attachment H" Is a compendium of Deposition exhibits . It includes copies of only those of the deposition exhibits which are cited in this pleading.   Within this attachment, each exhibit is ordered numerically according to its deposition tag numbers which is also the number by which it is  referred to in this pleading..

"Attachment I"  Includes copies of those of the additional exhibits which are not deposition exhibits. Within attachment G, each is  ordered numerically using the number assigned to it in this pleading..

"Attachment J":  Defendant Webster's responses to request to admit.

## OUR RESPONSE TO ALLEGATIONS IN THE DEFENDANT'S STATEMENT OF FACTS

1.-2.    **Admitted.**

3.       After Ms. Green moved to Room 310, she realized she had left some of her belongings in Room 311.  She contacted TopNotch staff and made arrangements to return to room 311 to retrieve her belongings.

**Admitted, but a more complete description is provided at ¶¶ 66-69 and 125-129), infra].**

4.       Richard Larabee ("Larabee"), a TopNotch security/maintenance person oversaw Ms. Green's return to Room 311.

**Admitted with the caveat that a more complete description is provided at ¶¶**

66-69, 73, 74, 126(a),  and 130-134(d), infra].

5.      While still in Room 311, and with Larabee present, Ms. Green opened the top drawer of the room's entertainment center, in which Larabee observed "approximately eight to twelve cellophane packets containing what appeared to be "white powder."

**Admitted that Richard Larabee made the statement as quoted,  except that as stated in Exhibit 1 [Which is also depo Ex. 101]  it was not "in" - but rather as she opened the drawer that Larabee saw what he saw.  More importantly,  what it was that Larabee actually saw at that time and place were maxipads that were pink in color and which had no powder at all in them. [For greater detail See ¶¶ 125-126(a), 126(b) and 126( c), infra] .**

6.      **Admitted.**

7.      After Ms. Green returned to Room 310, Larabee returned to Room 311. There, he observed white powder on the floor, and a clear plastic bag on a night stand. The bag contained a white paper towel and white powder.

**Admitted with the caveats that the white powder was cornstarch and that more complete description on this point is provided at ¶¶ 66, 66( c), 76, 77, 83, 85, 134(d), 135(b), 135( c) and 141].**

8.-9.   **Admitted.**

10.     Officer Webster had had drug training and training with regard to the field testing of cocaine, and had read about and watched videos concerning drug education.

**Admitted with the caveat that despite whatever training Webster may have had, Webster admitted that when interviewed about this episode Webster**

told his Police Chief that he is "not a drug man and could not tell the difference between cocaine and flour" (Infra at ¶ ¶ 87 and 89); that he thought the substance in question might be hashish rather than cocaine (infra at ¶ 90) and that he did not want to do the Green case because he felt he did not have the requisite knowledge or experience with drug investigations to feel comfortable doing it (Infra at ¶ 91][Also see the Chief's notes of the Interview, Depo ex. 124, p. 1]

11.     Officer Webster had attended two (2), week-long DEA enforcement schools that expressly covered field testing for cocaine.

Admitted with the following caveats.   There is no testimony that the field testing schooling Webster had involved the particular model of field test that was used to test Green's  powder.  It was despite his drug school attendance, that Webster still "was not a drug man", could not tell cocaine from flour and did not feel he had the requisite drug experience to handle the Green case.¶¶ 87 and 91.  For these reasons,  Officer Webster did not want to conduct the field test by himself wanted a second opinion. See ¶ 108.

12.     Officer Webster had done "maybe a dozen" field tests for cocaine.

Admitted with the following caveats.   There is no testimony that this field testing experience of Webster involved the particular model of field test that was used to test Green's  powder.  Despite this drug testing experience Webster still "was not a drug man", could not tell cocaine from flour and did not feel he had the requisite drug experience to handle the Green case.¶¶ 87 and 91.  For these reasons,  Officer Webster did not want to conduct the

field test by himself wanted a second opinion.  See ¶ 108.  Christiensen, the officer whom Webster procured to do and who did the physical acts involved in the field   described the extent of his prior cocaine field testing experience as "more than one" [Depo of Christiensen, p. 21, ll. 12-15].

13.-14. **Admitted.**

15.    Webster looked at the white powdery substance, which based on his training and experience, appeared to be cocaine.

**Denied.  In seeking a search warrant, Webster did submit a sworn affidavit which stated he looked at the white  powdery substance and that it appeared to him to be cocaine based on his training and experience, appeared to be cocaine.  But to the extent that his affidavit suggests that Webster has the requisite training and experience to identify cocaine it is misleading.   At his deposition Webster  testified that he did not have the requite experience and training to tell, by looking at it, whether the powder was cocaine. [Webster Depo at p. P. 29, ll. 4-9. Also see  [Chief Kaplan Deposition; p. 50, l. 21- p. 51, l, 6;   p. 14,  l. 6 - p. 15, line 22;   p 23 ll. 3-7][Deposition Ex. 124 ].  That is not what he told the Judge in his affidavit.  When asked at deposition which one these two statements was true [" based on his training and experience it appeared to be cocaine" (his sworn statement to the judge) or "your not a drug man you can't tell it from flour"(his statement to his Chief)], Webster testified that he would have been telling the judge the truth if he told him that he is not a drug man and cannot tell it from flour. [Depo of Webster, p. 27, l. 24- p. 29, l. 9].**

16.    Officer Webster testified in deposition: Based on what training and what experience I had, it looked like it might be cocaine.

**Admitted with the caveat that this testimony is misleading. Webster also testified at his deposition that he did not have the requite experience and training to tell, by looking at it, whether the powder was cocaine. [Webster Depo at p. P. 29, ll. We Also incorporate here our responses to ¶¶ 14-15, supra.**

17.    **Admitted.**

18.    Prior to February 11,2005, Officer Christiensen had had training in identification and field testing of drugs, including cocaine.

**Admitted with the following caveat. There was no evidence presented that Christiensen had any training in the Cocaine Field test that was used on the Topnotch baggie powder or indeed with any cocaine field test. The training Officer Christiensen testified he had was one eight hour course in identifying drugs which included cocaine and that what ever other drug trainings he had did not include cocaine. Depo of Christiensen, p. 29 l. 4- p. 31, l. 12. At Deposition, Christiensen testified that he did not ever tell Webster that *based on his observation*, the powder found in room # 311 was coke. [Depo of Christiensen, pp. 26, l. 18- 20.]**

19.    Prior to February 11, 2005, Officer Christiensen had done more than one field test for cocaine, and had been involved in investigations where there was evidence of cocaine.

**Admitted that when Officer Christiensen was asked in deposition how many**

field tests he had performed for cocaine, the best he could answer was " I have no idea.  More than one". [Depo of Christiensen, p. 21, ll. 12-15].

20.     With regard to Officer Christensen, Officer Webster testified in deposition: I know at the time, he was working with the County Drug Task Force and they had done several cocaine arrests just prior to this which he was involved in.

**Admitted that Officer Webster made this statement in deposition with the caveat that there is no evidence that the decision to arrest Green was made by Christiensen or even that he recommended such an arrest.  We incorporate our response to ¶¶ 18-19, supra.**

21.     On February 11,2005, Officer Christensen field tested the white powdery substance that had been on the night stand in Room 311, according to the field test kit's instructions.

**Admitted that on February 11, 2005 Officer Christensen participated in a field test of the substance that had been on the night stand in Room 311. The remainder of the allegations are denied.   For example:**

**- Webster admits he probably would not have arrested Green if the field test kit instructions had been read and followed.   See ¶ 110, infra;**

**- Webster admits the field test kit instructions were not followed. See ¶¶ 107-109 infra;**

**- The field test instructions were not read before the test was conducted.  See ¶¶ 107(a) -107( c), infra;**

**- Webster admits the field test was inaccurate [see ¶¶, 84-85 and 156  infra;]**

**- The field test observations the officer recorded in their reports show,**

according to the instructions, a negative rather than positive result for cocaine. See ¶¶ 92-98 and 103, infra;

- Webster does not disagree with the assessment of a Stowe police sergeant that the field test results were misinterpreted and that in conducting the test an ampule was punched wrong or something was done out of sequence. See ¶¶ 99-101, infra.

- Webster, cannot pawn off misinterpretation or the inaccurate field test on Christiensen because Webster himself observed the test and made his own interpretation that the test results were positive. See ¶¶105 and 155, infra;

- Webster does not dispute that the incorrect field test result was done with him in charge of the scene and that he is the one responsible to ensure that the test was done correctly. See ¶¶157-160, infra

22.     Present when Officer Christiensen field tested the white powdery substance were Officer Webster and another Stowe Officer, Officer Dougherty.

- Admitted in part and denied in part.  The test was performed in the presence of all three officers.  It was not mere presence.  Dougherty "assisted" in the test [Depo Ex 103, third paragraph].  Webster himself observed the test and made his own interpretation that the test results were positive. See ¶¶105 and 155, infra;

23.     Officer Dougherty recalls Officer Christiensen saying at the time, as he observed the white powdery substance: "I think this is cocaine." November 2, 2006 deposition of Michael Dougherty at 53..

Admitted with a caveat.  Though Dougherty does so testify, Christiensen

**denies having or communicating any opinion based on the appearance of the**

**powder. [Depo of Christiensen, pp. 26, l. 18- 20.]**

24.     Officer Dougherty believed that the white powdery substance did not

appear to be cocaine.

**Admitted with a caveat.  As framed this allegation understates the strength**

**of Dougherty's opinion that it was not coke but some other product and fails**

**to relate that Dougherty stated his opinion to Webster before Green was**

**arrested.  [Dougherty Depo,  p. 53, ll. 7-20 and p. 78, ll. 12-21].**

25.     When Officer Christiensen field tested the white powdery substance, all

three officers agreed the substance field tested positive for cocaine.

**Admitted with the caveat that for the reasons specified in response to ¶ 22,**

**supra, it was not just Christiensen who did the field test.**

26.-29.   **Admitted**.

30.     During the search, Ms. Green told the officers that the white substance

that was found in Room 311 was cornstarch that she applies to a rash on her leg.

**Admitted that Officer Dougherty wrote this and that it generally but not**

**exactly quotes Ms. Green about her rash.  See Depo Ex. 123, paragraph 2.**

31.-32.  **Admitted**

33.     At the conclusion of the search, Ms. Green was arrested for possession of

cocaine, as a result of the field test that Officer Christiensen had done.

**Admitted that Green was arrested for felony possession of cocaine, at the**
**conclusion of the search.  Otherwise denied.**

-        **The arrest was not just the passive episode suggested by the language**
**"Green was arrested".  It was an affirmative act by Webster - It was**

Webster who arrested Green [Depo of Webster, p. 65, l. 21 - p. 66, l. 2].

- For a number of reasons, it is not accurate to say that the arrest was the result of the field Test:

> - Webster testified that he based his arrest of Green in part on factors other than the field test, to wit his own inspection and opinion that the powder appeared to be cocaine, as Webster so testified at deposition. ¶ 86. Infra. [Depo of Webster, p. 65, l. 21 - p. 66, l. 2]. But Webster admits he is not a drug man and can't tell cocaine from flour or hashish. ¶¶ 87, 89 and 90, infra. Therefore Webster based his arrest decision on factors which he lacked the training and ability to assess but were other than the field test..

> - Webster made his decision to arrest Green before the search warrant was executed without knowing what the results of the search would be ¶¶ 118-120, infra.

> - Discoveries Webster made during the search of Green's new room pursuant to the search warrant rendered Webster's theory of the crime wholly impossible, untenable and ridiculous. ¶¶ 118-140, infra.

> - Webster did not reconsider his decision to arrest Green after the search of her new room undermined probable cause.¶¶ 118-135( c), infra.

- For a number of reasons, it is not accurate to say that the arrest was the result of what Christiensen did with the field Test:

> - Webster himself observed the test and made his own interpretation that the test results were positive. See ¶¶105 and 155, infra;

> - Webster admits the field test was inaccurate. See ¶¶, 84-85 and 156 infra;

> - The field test instructions were not read before the test was conducted. See ¶¶ 107(a) -107( c), infra;

> - The field test observations the officer recorded in their reports show, according to the instructions, a negative rather than positive result for cocaine. See ¶¶ 92-98 and 103, infra;

> - Webster admits the field test kit instructions were not followed. See ¶¶ 107-109 infra;

- **Webster admits he probably would not have arrested Green if the field test kit instructions had been read and followed.    See ¶ 110, infra;**

- **Webster does not disagree with the assessment of a Stowe police sergeant that the field test results were  misinterpreted and that in conducting the test an ampule was punched wrong or something was done out of sequence. See ¶¶  99-101, infra.**

- **Webster does not dispute that the incorrect field test result was done with him in charge of the scene and that he is the one responsible to ensure that the test was done correctly. See ¶¶157-160, infra**

34.-40. **Admitted.**

41.    While Ms. Green was still at the Stowe Police Department, a second field

test was performed on the suspect substance by Stowe Police Department Detective

Sergeant. Edward Stewart ("Detective Stewart"). The result of that test was the substance

did not test positive for the presence of cocaine.

**Admitted except that the Detective Sergeant Stewart, the officer who**

**performed the test,  characterized the result as "negative" rather than "not**

**test positive". Depo Ex 111 and Depo of Stewart, p. 37, ll. 4-5.  Also see**

**paragraph 44, infra.**

42.-44. **Admitted.**

45.    When Ms. Green first arrived at the Stowe Police Department with Officer

Webster, it was approximately 7:47 a.m.

**Admitted with the caveat that she was arrested before she was taken to the**

**police station. The arrest report indicates that 7:13 was the time Green was**

**arrested.  Depo. Ex 112.**

46.    Prior to the result of the Lab test being known, Ms. Green was given a

citation appear in Lamoille County District Court on April 4, 2005, and released at
approximately 9 :00 a..m.

> **Admitted except for the time of release. The time of Green's release is not**
>
> **established here. Exhibit 23 is a citation. It does not state what time it was**
>
> **issued or what time Green was released on citation.**

47.     Two of Ms. Green's co-workers came to get her when she was released.

> **Admitted in part, denied in part, as follows. The people who came to get**
>
> **Green when she was released were Mr. Donahue and Ms Spears. While Ms.**
>
> **Spears was a co-worker, Mr. Donahue was one of her very senior**
>
> **supervisors.**

48.     She returned to TopNotch, showered, packed, and then attended the
meeting at TopNotch that she had been scheduled to attend with her co-workers.

> **Admitted in part, denied in part, as follows. The meeting involved not only**
>
> **co-workers but also supervisors.**

49.     Still on February 11, 2005, after Chief Kaplan .learned of the Lab test
results, he attempted to contact Ms. Green while she was still at TopNotch. She did not
want to speak with him. Chief Kaplan spoke with Ms. Green's immediate supervisor and
related that the citation which Ms. Green had received could be disregarded and that she
did not have to appear in court.

> **Admitted with the caveat that the first time Kaplan gave Green something in**
>
> **writing that she could rely upon to the effect that she was not required to**
>
> **appear in Vermont in response to the citation was eleven days after her**
>
> **arrest. Depo of Kaplan, p. 45, ll. 1-23.**

50.     Still on February 11,2005, Chief Kaplan sent Ms. Green a certified letter informing her that the white powder was confirmed to be cornstarch, not cocaine. The letter told Ms. Green she could disregard the citation and assured her that no information would be given to the press. Finally, the letter extended Chief Kaplan's sincere apologies on behalf of the Stowe Police Department, and invited her to call if he could be of any further assistance. Ms. Green received that letter on February 22, 2005.

**Admitted except that the cited material does not establish the date when Kaplan actually sent the Letter dated February 11, 2005 which was not received by Green until eleven days later.**

51.     **Admitted**.

52.     In deposition, Ms. Green was asked whether during the incident, there were any overt acts or any words spoken that would lead a reasonable person to think that what was happening was racially motivated. Ms. Green's response was: [I]n my mind, yes."  When pressed as to whether she heard any racial epithets or any reference to her skin color by any of the officers or anything to that effect, Green replied: "Not that I can recall".

**Admitted in part, denied in part.  It would be more accurate to relate, verbatim the two questions Green was asked about this and her answers there to. They are:**

**Q.     Were there any over acts or any words spoken that would leave a reasonable person in your view to think what was happening was, with the police, was racially motivated in any way?**

**A.     I would say the whole incident in my mind, I can only — you're asking me to speak for me, in my mind, yes.  I think sometimes you see what you want to see.**

Q.    **Understood.  I just want to be, for thoroughness sake, no racial epithets or any reference to your skin color by any officers or, hey, you're a black gal from Philadelphia, anything to that effect?**

A.    **Not that I can recall. [Depo of Green at p. 35, ll. 6-17].**

**Later in her deposition, Green testified to racial assumptions that she had a back eye.  [See her Depo at p. 50, ll. 1-16 and p. 37, ll. 7-8.]**

**Further, there were references in the Police Reports and supporting affidavits to and or relating to the color of Ms. Green's skin. [Depo Ex. 101, p. 1, third paragraph; Depo. Ex. 103, fourth Paragraph; Depo Ex. 106, p. 1, Paragraphs # 2; Depo Ex 112; Depo Ex. 123 Paragraph # 6].**

## PLAINTIFF'S OWN AFFIRMATIVE ALLEGATIONS WITH RESPECT TO THIS MOTION

### A. GENERAL BACKGROUND

53.    The Plaintiff, Pamela Green (hereinafter "Green"), is a citizen of the State of Pennsylvania and is a resident of Philadelphia within the Federal Judicial District of Eastern Pennsylvania. [Admitted by ¶ 3 of the Answer to the Complaint].

54.    Green is a person of color and is of the African-American race. [Admitted by ¶ 4 of the Answer].

55.    The Defendant Edwin Webster, is a citizen of the State of Vermont and a resident of the Federal Judicial District of Vermont.  [Admitted by ¶ 8 of the Answer].

56.    At all times material, the Town of Stowe was and is now a municipal corporation organized under the laws of the State of Vermont.  [Admitted by ¶ 77 of the Answer].

57.    The Town of Stowe did, at all times material, operate the Stowe Police Department. [Admitted by ¶ 78 of the Answer].

58.    The Defendant Webster was, at all times material, employed by the Town of Stowe as a municipal police officer in the Stowe Police Department. [Admitted by ¶ 9 of the Answer].

59.    In arresting Plaintiff, Webster was acting as an officer of the Police Department of that Town, utilizing powers pertaining to the enforcement of state laws invested in him as a Municipal Police Officer by state law. [Admitted by ¶ 82 of the Answer][Depo of Webster, p. 64, ll. 14-22].

60.    The TopNotch is a Hotel in Stowe which provides lodging to transient guests  [Admitted by  ¶12 of the Answer].

61.    From February 8, 2005 through February 11, 2005, Green's employer, the newspaper, USA Today, held a regional marketing meeting at TopNotch. [Admitted by  ¶ 14 of the Answer].

62.    This marketing meeting at TopNotch was attended by Green, Green's regional peers and executives including Green's supervisors.  [Admitted by  ¶ 15 of the Answer].

63.    During the meeting, from February 8th-11th, Green was a registered guest of the TopNotch Hotel. [See the Admissions in  ¶¶ 14-16 of the Answer].

## B.  THE BAGGIE OF WHITE POWDER IN TOPNOTCH ROOM # 311

64.    During the evening of  February 11, 2005,  Pam Green had changed rooms to move from TopNotch Room # 311 across the hall to Room 310 [Depo Ex 101][Depo of Larabee, p. 5, ll. 10-16][Admitted by  ¶¶ 17 and 84 of the Answer].

65.    Green uses cornstarch for health and cosmetic  purposes because she gets hives. [Admitted by ¶ 37 of the Answer].

66.    But when she moved to Room # 310, Green left some of her personal items in room #311. [Depo Ex 101][ Depo of Larabee, p. 5, ll. 10-16] [Admitted by  ¶ 18 of the Answer]. These items included:

66(a).  Feminine sanitary pads which were enclosed in pink opaque plastic [Admitted by  ¶¶ 18, 32 and 36 of the Answers to the Complaint];

66(b).  A one foot diameter spot of cornstarch that Green had spilled on the floor [Admitted by ¶ 38 of the Answer]; and,

66( c).  A plastic bag containing cornstarch weighing 53 grams  [Admitted by ¶ 39 of the Answer].

67.    Upon moving from Room # 311, Green had given up the key to that room and therefore could not retrieve any of the items she had left there with requesting and obtaining the assistance of the Hotel. [Depo of Larabee, p. 6, ll. 6-17].

68.    On February 11, 2005, Richard Larabee was working as the night security and maintenance person at Topnotch Resort & Spa in Stowe [Deposition of Larabee, p. 4, ll. 11-14].

69.     In response to a request from Green to let her back into Room # 311 to retrieve some personal items, Larabee assisted by unlocking that room and staying with her while she was in there [Depo Ex. 101][Also see the admissions in ¶¶ 19, 20, and 24 of the Answer].

70.     On meeting Green, Larabee noticed that she was black.  [Admitted by ¶ 22 of the Answer].

71.     Like many African Americans and other people of color, Green has pigmentation under both her eyes. [Admitted by ¶ 26 of the Answer].

72.     In his later contact with Police, Larabee described Green as a short black female.  [Admitted by ¶ 25 of the Answer], with what possibly was a black left eye[ Depo Ex. 106, ¶ 2].

73.     Larabee noticed that during her return to Room #311, Green removed approximately eight to twelve "cellophane packets" sized four inches by four inches by two inches "containing what appeared to be white powder" from a drawer and put them in a heavy duty paper shopping bag which she took back with her to her new room, Room # 310.  [Depo Ex 101][Depo of Larabee, p. 5, ll. 10-21].

74.     In describing his observations,  Larabee never referred to these packets of white powder as "bricks" [Depo of Larabee p. 10, l. 24, - p. 11, l. 13].

75.     However, Webster used the word "bricks" to describe Larabee's observations of these packets to  the search warrant issuing judge. [Depo Ex 106, ¶¶ 3 and 4]

76.     Larabee called in the Police because when he later went back to look again in room # 311, he noticed a clear plastic bag containing white powder sitting on the night stand between the two beds and a  big spot of white powder on the carpeted floor between the beds, [Depo. Ex. 101][Depo of Larabee at p. 6, l. 22 - p. 7, l. 10 and p. 8, ll. 7].

77.     Green was not arrested for anything other than the white powder that was in the plastic bag found in Room # 311[ Depo of Webster, p. 140, ll. 21-24][Also see the Admission in ¶ 43 of the Answer].

78.     Webster deemed the quantity of this "cocaine recovered" to be "more than for personal use" [Depo Ex 106, ¶¶ 10-11].

79.     Webster charged Green with committing the felony, possession of cocaine in violation of 18 Vermont Statutes Annotated § 4231((a)(3).  [ Depo of Webster p. 64, ll. 19-25]

Page 16 of 37

80.     This baggie of suspect white powder found locked in Room # 311 weighed 53 grams [Depo Exs. 106, ¶ 8 ].

81.     A 53 gram coke bust would have been the largest the Stowe Police Department ever made. [Deposition of Webster, p. 151, ll. 3-13]

82.     A field test for cocaine was done at Topnotch that night on the powder in the baggie found in room #311 [Webster's Affidavit of Probable Cause, Depo Ex 106 at ¶¶2, 4 & 7.]

83.     The powder being tested in the field test at the Hotel was in fact Cornstach, not cocaine [Depo of Webster, p. 129, ll. 6-13][Depo Exhibits 119, 120 and 122.  Also see Defendant's Answers to Request to Admit ## 26-27].

84.     **Webster admits that the Cocaine field test conducted at the Hotel was inaccurate**:

A.     In a situation like this you hate to be the one that — that arrested them.

Q.     What do you mean in a situation like this?

A.     Well, where *it turned out that we had an inaccurate test*.

[Emphasis supplied. Please  see the language including and following the quote, Depo of Webster, p. 75, l. 23- p, 76, l. 2;. Also see and p. 131 ll. 22-24]

85.     However, it is now undisputed that the "cocaine" for which Plaintiff Pam Green was arrested was a bag of  the 100% cornstarch which she used for allergy skin problems she has on her legs.  [Depo of Webster, p. 129, ll. 6-13][ Depo Exhibits 119, 120 and 122].

## C.  WEBSTER ARRESTED GREEN BASED ON CONCLUSIONS AND OBSERVATIONS OF HIS OWN HE ADMITS HE WAS NOT QUALIFIED TO MAKE WHICH WERE INDEPENDENT OF THE FIELD TEST

86.     **As the Defendant himself testified that the arrest was based in part on something other   than the field test, to wit his own inspection and opinion that the powder appeared to be cocaine** [Admitted by  ¶ ¶ 86-87  of the Answer].   Also:

Q   You made the arrest in part on your observation of this white powder, correct?
A   Yes.

Q   And on the basis of your training and experience  that looking at this white

powder     it appeared to be cocaine?
   A   Yes.  [Depo of Webster, 65, l. 21 - page 66 line 2].

87.     Yet upon being debriefed by his Chief after the whole course of errors giving rise to Green's arrest was discovered, **Webster admitted that he did not have sufficient**
**ability to enable him to tell the difference between cocaine and flour when he saw it** [Chief Kaplan Deposition; p. 50, l. 21- p. 51, l, 6;   p. 14, l. 6 - p. 15, line 22;   p 23 ll. 3-7][Deposition Ex. 124 ]

88.     Webster submitted a sworn affidavit of probable cause to a judge for a search warrant [See Deposition Ex. 106].  Not withstanding his admitted inability to distinguish cocaine from flour, Webster alleged in his affidavit that based on his training and experience the powder in question appeared to be cocaine and that he had the necessary training and experience to make that observation. [Chief Kaplan Deposition, p. 70,  l. 10 - p. 71, line 18][ Depo Exhibit 106][Depo of Webster, p. 26, l. 4- p. 27, l. 17 and p. 26, l. 13-p. 29, l. 9].

89.     Webster lied to the judge. When asked which one these two statements was true- " based on his training and experience it appeared to be cocaine" (his sworn statement to the judge) or "your not a drug man you can't tell it from flour"(his statement to his Chief), Webster testified "I'm not a drug man" and that he did not have the training and experience to tell, by looking at it, that the powder was coke. [Depo of Webster, p. 27, l. 24- p. 29, l. 9 and p. 26, l. 13- p. 29, l. 9].

90.     Indeed, **Webster knows so little about the appearance of Cocaine that in his debriefing he told Chief Kaplan that he thought that the suspect white powder might be hashish rather than cocaine**. [Depo of Chief Kaplan, p. 111, l. 24, - p. 112, l. 7;   p. 29, ll. 4-15; and p. 30, l. 22- p. 31, l. 2 ].

91.     In the debriefing Webster admitted to his Chief that he did not want to do the Green case. This is because Webster felt did not have the requisite knowledge or experience with drug investigations to feel comfortable doing it [Depo. of Webster, p. 151, l. 17- p. 152, l. 23].

## D.  THE FIELD TEST AT TOPNOTCH OF THE WHITE POWDER IN THE BAGGIE

92.     As Webster admits, none of the police reports of the three officers observing the field test indicate that all of the three color changes needed to comply with the field test instructions requirements for a positive test result occurred. [Depo. of Webster,  p. 124, l. 16- p. 125, l. 1 and  p. 126, ll. 5-7].

93.     The reports of the three officers present and observing the field testing

Page 18 of 37

done at Topnotch of the white Powder found in the baggie in room #311, record observations they made of that field test [See Reports of Officer Dougherty, Christiensen, and Webster, Deposition Exhibits 103, 105, 106, respectively].

94.    For a positive test result, the instructions for the cocaine field test kit "NIC Test G Scott reagent (Modified) for cocaine salts and cocaine base" requires three distinct color changes, interspersed with the breaking of three ampules, in the color sequence blue, then pink, then pink over blue. [See The Instructions, Deposition exhibit 834]. Without all three required color changes, the test result cannot be positive [Deposition Ex. 834]

95.    Webster admits that the field test instructions require three specific color changes for a positive test result. [Deposition of Webster, p. 120, ll. 9-13 and p. 125, ll. 2- 20]

96.    Referring to the first and second color changes, The instructions state, in part, "3. Break the left ampule. Agitate gently. A blue color will develop .... *If a blue color still does not develop, terminate test.* 4. Break the middle ampule. Agitate gently. Blue color will turn pink ...." [Emphasis supplied. See Depo ex 834].

97.    The field test observations these officers recorded in their respective police reports are not those which the test instructions required for a positive test result. *On the contrary, interpreted in accordance with the instructions of the test kit, these observations which the officers reports record indicates a negative test result for cocaine.*

97(a). Webster admits that none of the three officers reports indicate that there was the color change to completely blue and the color change to completely pink that are both required for a positive test result. [Depo of Webster, p. 124, ll. 4-20.]

97(b)   Webster admits that none of the three police reports states that during the test a the required blue color developed. [Depo of Webster, p. 125, ll. 2-14].

97( c). Webster admits that none of the three police reports states that the during the test the required change from a blue color to a pink color happened. [Depo of Webster, p. 125, ll. 15-20.

97( d) Officer Dougherty reported observing the colors blue and pink being at the *bottom* of the container *at the same time* but does not describe solely blue, blue turning to pink, multiple color changes or color changes being through out the container. [Depo ex 103 and Depo of Dougherty, p. 38 l. 3- p. 39, l. 4].

97(e)   Moreover, Dougherty asserts that what he wrote is what he saw and that if he had seen something different his report would have been different. [Depo of

Dougherty, p. 38, ll. 13-15 and p, 39, ll. 507].,

97(f)    Indeed Webster admits that Dougherty's report  recites there was only one single color change [Depo of Webster, p. 123, l. 11- p. 124, l. 14 and p. 125, ll. 21-25][Also Depo Ex 103].

97(g)    Webster also admits that there is no where in officer Christiensen's report that describes more than one "singular" distinct color change. [Depo of Webster, p. 121, l. 14- p. 122, l. 10]. [Also Depo Ex 105]. Indeed, Webster's own  counsel concedes that the report of Officer Christensen does not  record the color changes required for a positive test result [Dep of Stewart, p. 49, ll. 3-8 and p. 45, l. 17- p. 46, l. 2]][Deposition of Webster, p. 121, l. 14- p. 122, l. 14];

97(h)    Indeed, as Webster admits, his own statement, which is the affidavit of probable cause, - does not  record the color changes required for a positive test result [[Depo Ex. 106, ¶ 7]  and Depo of Webster, p. 122, l. 17- p. 123, l. 2; and p. 123, l. 22- p. 124, l. 3];

98.    Thus the reports of each of the three officers who witnessed the field test of Green's powder at Topnotch  record observations  which differ from that complete combination and sequence of color changes the instructions require for a positive test result.

99.    Stowe Police Detective Sergeant Stewart , when asked if there was a mistake or problem with the Green investigation, stated " It seems like there might have been a misinterpretation of the field test...." [Depo of Stewart, p. 76, ll. 8-11]

100.    Webster does not disagree with  Stewart's assessment  that the field test results were misinterpreted. [Depo of Webster, p. 130, ll. 3-11].

101.    Webster does not disagree with Chief's Kaplan's contention that in conducting the first field test, an ampule was punched wrong, something was done out of sequence. [Depo of Kaplan, p. 61, ll. 11-24][ Depo of Webster, p. 130 ll 12-21].

102.    But Webster has no other explanation for the field test done in his presence and  under his charge inaccurately interpreting cornstarch to be cocaine. [Deposition of Webster, p. 129, ll. 14-17 and p. 131, l. 25- p. 132, l. 5].

103.    By recording results at variance with them, the officers reports corroborate the Plaintiff's contention that the interpretation of the test result as "positive" was not based on the instructions, whether those instructions were never read, not recently reviewed or were ignored.

104.    Webster cannot pawn off the misinterpretation of the results of the Topnotch field on the other officers:

105    According to Christiensen, Webster himself observed and interpreted as positive the results of the field test field test done at Topnotch of the white powder found in Room #311.

> "I then field tested the substance with Cpl, Webster and Ptl. Dougherty present. I broke the ampule's from left to right, the test showed a distinct color change *we all agreed the substance field tested positive for cocaine*" [emphasis supplied]  [See the report of Christiensen, Depo ex 105]

106.    Asked how many cocaine field tests he had done before administering the one on February 11th,  the most specific answer Christensen could give was "more than one" [Depo of Christensen, p. 21, ll. 12-15].

## E.    WEBSTER FAILED TO ENSURE THAT THE OFFICERS PERFORMING THE COCAINE FIELD TEST ON THE WHITE POWDER FOUND IN ROOM # 311 FOLLOWED THE TEST'S INSTRUCTIONS.

107.    **Webster failed to  ensure that the Officers performing the cocaine field test on the white powder found in Room # 311 followed the test's instructions.**

107(a).   The Box in which the NIK Field Test kits for Cocaine are packaged states:  "CAUTION: **Review** test instructions **prior to use**".  [Emphasis supplied. See Attachment G-1, a photocopy of the package for the field test kits].  Use of the word "review" dispels the notion that this caution is satisfied by a single reading which occurred some time in the  past.

107(b).   The field test kit itself  cautions the user to "read instructions before using."  But the instructions which the package cautions must be read are not located on the field test kit itself.  the only language on the container of  liquid that comprises   NIK Field Test kit for Cocaine is "Scott Reagent System Modified", The letter G within a circle, "Cocaine" and   "CAUTION: Read Instructions Before Using. Contains strong Acid".  See Attachment G-2, a photocopy of the Kit.

107( c)   Webster's deposition testimony establishes he did **not** ensure that the "review before using" instruction was complied with.

A.    It's the instruction sheet for the NIK field test kit.
Q.    And did you read this instruction sheet on February 11th, 2005?
A.    No, I did not.
Q.    Was it read to you?
A.    No It was not. [Depo of Webster, p. 7, l. 1-7]
            ....
Q.    Did somebody read the instructions as the test was being performed, read them out aloud?

A.      I don't recall anybody reading them out loud, no. [Depo of Webster, p. 8, l 7-9]

108.    Not surprisingly, the Green incident caused Detective Sergeant  Stewart more concern about having officers follow the field kit directions then the possibility that the field kit was faulty. [Depo of Stewart, p. 37, l. 20- p. 38, l. 15].

109.    As a result of his own failure to review the instructions, or indeed to have ever read them,   Webster arrested Ms. Green before he became aware of and without complying with yet another of the field test's *substantive* requirement:

Q.      Did you use the test in conjunction with others in the polytesting system?

A.      No.

        Mr. Farnham: Form objection.

BY MR. PUTTER:

Q.      So you arrested her without doing that, correct?

A.      That's correct.

Q.      So you really didn't follow this instruction, did you?

A.      No..[Depo of Webster, p. 74 ll 12-21]

                        ....

A.       Its not standard procedure to run two tests.

Q.      But the instructions say so, don't they?

        Mr. Farnham:  Form objection.

A.      Apparently, from reading them, yes they do.

Q.      And you didn't know that on February 11th, did you?

A.      No, because it's not standard procedure.

Q.      Because you didn't read the instructions completely through on February 11th, correct?

A.      That's correct, I did not read the instructions.[Depo of Webster, p. 84 ll 12-21].

## F.   BUT FOR WEBSTER'S FAILURE TO READ AND FOLLOW THE FIELD TEST KIT INSTRUCTIONS, HE WOULD NOT HAVE ARRESTED GREEN

110.   Upon being required to read them at his deposition, **Webster admits that he probably would not have arrested Green if he had followed the instructions when the cocaine field test was conducted at the Hotel.** [Deposition of Webster, p. 74 l. 1- , p. 75, l. 5]

Q.   So you arrested her without doing that, correct?

A.   That's correct.

Q.   So you really didn't follow this instruction, did you?

A.   No.

Q.   And as you said it would have been advisable had you done so, correct?

A.   Yes.

    Mr. Farnham: Form Objection

BY MR. PUTTER

Q.   Because then you wouldn't have arrested her, right?

    Mr. Farnham: Form Objection

A.   Probably not. [Depo of Webster, p. 74 ll 12-21]

## G.   OTHER EXCULPATORY EVIDENCE WEBSTER IGNORED AT THE TIME HE DECIDED TO ARREST GREEN.

111.   **Prior to Green's arrest Stowe patrol officer Michael Dougherty told Webster that he knew the white powder in the baggie was not coke, but rather was some different product.** [Dougherty Depo, p. 53, ll. 7-20 and p. 78, ll. 12-21]. Dougherty, one of the three police officers who was present at Room 311 of the Topnotch Hotel on February 11, 2005 and viewed the white powder found in that room [Depo Ex 103]

112.   In a " report of investigation" Webster signed 4 months after arresting Green, admitted his own inadequacy in concluding the powder was coke: "after viewing the powder" that "I felt that it might be cocaine" but "I wanted a second opinion" on the subject [Depo of Kaplan, p. 104, l. 11- p. 108, l. 1][ Depo Ex. 131]

113.   Webster does not deny that Dougherty gave him this opinion at the scene [ Webster Depo at p. 101, l. 6 - p. 103, l. 2 and at p. 103, ll. 1-5].

114.   Though he claimed that even after looking at the suspect powder he still needed needed a second opinion, Webster ignored Dougherty's stated opinion that the suspect white powder was not coke.

115.    Moreover, Webster did not obtain that second "it looks like coke" opinion from  Morrisville Police Officer Garth Christensen, the  third officer  who was also   present at Room 311 of the Topnotch Hotel on February 11, 2005 and viewed the white powder found in that room. [Deposition Exhibits 105 and 505;Christensen Depo at p.5, ll. 12-23].

116.    Christensen testified he did not tell Webster or anybody else that, based on his own observing the powder in the bag found in Room 311, that the powder was coke or appeared to be coke [Depo of Christensen, p. 28, ll. 20-25].

117.    Webster does not dispute that [Depo of Webster, p. 104, ll. 9-19].

## H.  WEBSTER DID NOT RECONSIDER HIS DECISION TO ARREST GREEN AFTER THE SEARCH OF HER NEW ROOM UNDERMINED PROBABLE CAUSE

118    Before the search, Webster had already decided that Green's arrest was justified even if the search discovered nothing. [Depo of Webster, p. 71, ll. 2-5].

119.    Webster based his  warrant request in part on his belief that what Green had taken back to Room 310 from room #311 were "bricks" of cocaine. [ In addition to his own level of training and experience as he employed it to make a visual assessment that the white powder in the Room 311 night stand baggie was cocaine] [Depo Ex. 106, ¶¶ 3, 4, 7 and 11 and Depo Ex . 107].

120.    Based on his application therefore, a warrant was issued which authorized Webster to search Topnotch Room #310 for, and if found there, seize any drugs, drug paraphernalia, ledgers, personal telephone book which may help in a continuing investigation, and large sums of currency which may have been used or will be used in drug transactions." [Depo Ex. 107 and 108]

121.    Pursuant to this search warrant, Webster  with other officers, completed a search of Green's hotel room, TopNotch Room 310. [Admitted by  ¶ 98 of the Answer].

122.    Upon execution of the warrant, there was nothing listed by it that was found in the search of Room #310 [Depo of Webster, p. 135, l. 19- p. 136, l. 2.].   Indeed there was nothing seize able at all found in the search of Room # 310 [Depo of Webster p. 39, l. 23- p. 40, l. 7]

123.    Even Webster admits that he had less incriminating evidence when he finished the search than when he started it. [Depo of Webster, p. 136, ll. 14-18].

124.    Amongst the exculpatory things Webster learned during the search but did

not know at the time he decided to arrest Green were the following:

125(a). During the search, Webster learned and acknowledged that the items that his affidavit in support of an application for a search warrant to search Green's hotel room described as "bricks" of cocaine were actually maxipads [Admitted by ¶ 100 of the Answer]. - They were not coke - be it bricks, packets or otherwise [Depo of Webster, p. 56, l. 25- p. 57, l. 4];.

125(b). The packets in question were not white but pink [Depo of Webster, p. 57, ll. 8-14];

125( c). The packets in question did not have any white powder in them [Depo of Webster, p. 63, ll. 2-6];

125(d). Green did not have a blackened left eye as Larabee imagined and reported [Depo of Webster, p. p. 57, ll. 5-7 and Depo Ex 106, ¶ 2];

125(e). There were no drugs, drugs paraphernalia or any evidence of drug dealing or any other crimes in Green's Room, Room # 310. [Depo of Webster, p. 135, l. 19- p. 136, l. 2 and p. 39, l. 23- p. 40, l. 7];

125(f). Prior to and during her arrest and detention, Green repeatedly advised Webster and other police officers that the powder she had left in room 311 was cornstarch which she used for cosmetic purposes and was not cocaine. [Admitted by ¶ 108 of the Answer][Also see Depo of Webster, p. 78, ll. 11-19].

126.    Green was arrested and transported to the Stowe Police Department in police custody [ Admitted by ¶ 101 of the Answer].

127.    But having already decided, even before the search was conducted, that he would arrest Green, Webster made his arrest decision without knowing or taking into consideration facts which became known to him by the time of arrest, to wit the results of the search. [Depo of Webster, p. 72, l 4-10].

## I.  THE IMPORT OF LEARNING THAT THE COCAINE "BRICKS" WERE MAXIPADS

128.    The discovery during execution of the search warrant that what Webster suspected were bricks of cocaine were in fact maxipads had no impact on Webster pre-search decision to arrest Green. [Depo of Webster, p. 71, l. 24 - p. 72 l. 19 and p. 72, ll. 17-19].

129.    At the time of the incident, it was not a violation of 18 V.S.A. §

4231(a)(3) for Green to be a person of color, to possesses maxipads, and/or to possess or use cornstarch for cosmetic purposes. [Admitted by ¶ 121of the Answer].

130.    Discovery that the suspect "bricks" were maxipads, and that there were no drugs, drugs or drug paraphernalia in Room # 310 renders it very significant that when Larabee went with Green to retrieve her maxipads, he had to unlock room 311 to let her in, and then he locked the door again as they were leaving [see Depo of Webster, p. 144, ll. 5-19] [Depo Ex. 106, ¶ 3 and ¶ 4].

131.    That is because once she left room #311 with her shopping bag, Green could not retrieve the baggie of suspect powder that had been left on the night stand in there without contacting Larabee again and having him unlock the door to let her back in [Depo of Larabee at p. 8, ll. 8-14][Depo of Webster, p. 48, ll. 9-17 and p. 144, ll. 5-23].

132.    It would not make sense to Richard Larabee that Pam Green would come back to Room # 311 to get her maxipads but leave a bag of coke [Deposition of Larabee, p. 9, ll. 14-16.]

133.    Indeed, Webster admits that Green had abandoned anything left in room # 311 including the baggie of white powder and the spot of powder on the floor [Depo of Webster, p. 65, ll. 1-20][Admitted by ¶¶ 85 and 86 of the Answer].

134.    So Webster's theory of the case at the time he arrested Green had to be that she was a drug dealer who deliberately made it so that she could not do business – If she was a dealer, she was one who having no other drugs, no drug paraphernalia, no drug business cash and no drug business address books, abandoned her only suspected "stash". Webster himself admits:

134(a).    The only stash of drugs she had was one she could not retrieve without the Hotel letting her in to do so;[Depo of Webster, p. 61, l. 8-p. 62, l.4.]

134(b).    and in point of fact when she did make arrangements with the hotel to get back in she took her maxipads but did not take the stash [Ibid.];

134( c).    and she also left abandoned a one foot diameter spot of her stash on the floor [Ibid]; and

134(d).    and she also abandoned a fifty three gram bag of her stash leaving on the table where anybody could see in when they walked in. [Ibid].

135.    The flawed field test notwithstanding, that the circumstances were "strange" if Green was a drug dealer should have caused Webster to reconsider his decision to arrest her.

135(a).    His learning that Green's "bricks" were maxipads should have made

Webster realize  not only that she had no drugs in her room, but that Green had no stash what-so-ever.

135(b).  This is so whether or not there were drugs in the locked  Room #311 because Webster knew that whatever was in Room # 311  was not only abandoned by Green but  inaccessible to her. [Depo of Webster, pp. 60, ll. 12-24; p., 145, ll. 11-24 and p. 65, ll. 1-20].

135( c).  as Webster, himself, testified:

Q       So as a dealer at the time you arrested her, where was her stash?

        Mr. Farnham: Form Objection.

**A.      There was no stash** [Deposition of Webster p. 60, ll. 12-15]

                                ....

**Q       So if she's a drug dealer and you're arresting her and her only drugs**

**are in Room 311, how does she conduct business?**

        Mr. Farnham: Form objection

**A.      She doesn't at that point.**

Q       So that doesn't make a whole lot of sense for a drug dealer to do that, does

it?

        Mr. Farnham: Form objection

A.      The actions of drug dealers don't make much sense anyway.

**Q.      But this action doesn't make any sense at all, does it?**

        Mr. Farnham: Form objection

**A.      No, it doesn't..**

Q       Did you take that into account before you arrested her?

A.      We thought it was strange, yes.

Q       Why did you think it was strange?

**A.      Well, normally a drug dealer don't leave their drugs.**

**Q       She didn't just leave her drugs, she left them where she couldn't get**

        **them?**

**A.      That's right.** [Depo of Webster, p. 147, l. 16-p. 148, l. 13].

                                ....

Q      **So what did you think about that the only time she went back to the**
**room was not to get drugs but to get maxipads?** What did you think about that?

A      **Strange**.

Q      Why?

A.      **Well you normally think a drug dealer would get their drugs?** [Depo
of Webster, p. 148, ll. 19-25]


## J. SOME ADDITIONAL FACTORS BEARING ON WEBSTER'S ARREST OF GREEN

136.    Although Webster could have investigated Green's claims of innocence
before he took her into custody, Webster chose not to do so. [Depo of Webster, p. 78, ll.
18- p. 79, l. 17.

137.    Webster could have and should have arranged to do a second field test
before he took Green into custody but he did not do so [Depo of Webster, p. 73, l. 1- p.
75-l. 3 and p. 176, ll. 12-19].

138.    Webster had almost five hours to do  a second test before he arrested
Green.    By 2:08 am, the first field test had been completed [See Depo of
Webster, p. 99, l. 7 - p. 100, l. 9].   Green was not taken into custody until after
6:58 a.m [See Depo of Webster, p. 109, l. 25- p. 110, l. 23.]

139.    Webster's explanation for not handcuffing her while transporting her to
the Police Station was that **Green did not seem guilty to him** [Depo of Webster, p. 35, l.
1- p. 36, l. 8 and Depo. Ex, 124].

140.    Moreover, at the time he arrested her, Webster thought **Green's facial
expression "was not that of a person being caught"**. [Deposition of Webster, p. 35, l.
1- p. 36, l. 8 and Depo. Ex, 124].

## K.  THE POST ARREST (SECOND) SECOND FIELD TEST

141.    After Green's arrest,   another test done  on the same white powder,
performed by Detective Sargent Stewart, a more experienced police officer using the
same type of field test kit, was negative for cocaine [Deposition of Webster, p. 81, ll. 14-
19 and p. 126, ll. 20-25; Depo Ex 111 and Ex 123, p.2, ¶ 9][Also see the admissions in ¶¶
106-107  of the Answer].

142.    It was his natural curiosity as a detective that prompted Stewart to do his
field test.  That curiosity was prompted by the large quantity of cocaine reported,
the factor that there was an amount of powder left on the floor which is consistent

with Green's explanation that it was cornstarch she put on her legs since "usually you try not to spill your cocaine" [Depo of Stewart, p. 77, l. 4-19]. Stewart did what Webster should have but failed to do before arresting Green.

143.    There was not any reason to detain Green after the second field test.[Depo of Webster, p. 164, ll. 14-16].

144.    Yet Green continued to be detained in custody after the "negative for cocaine" result of this second field test, the one done by Detective Stewart, was known [Depo of Webster, p. 82, ll. 22-24][Admitted by ¶ 109 of the Answer].

## L. THE TEST BY THE VERMONT STATE LABORATORY

145.    Later, a third test done on the same white powder by the Vermont State Laboratory confirmed that the white powder was not cocaine but cornstarch. [Depo of Webster p.129, ll. 6-13][Depo Ex 119, Ex 122, and Ex 123, p.2, ¶ 12][Also see the admission in ¶¶ 111- 112 of the Answer].

## M. THE "CLOSING" OF THE CRIMINAL CASE FILE ON GREEN

146.    On February 15, 2005, four days after arresting Green, Webster prepared and placed into the Stowe Police Department file, a Supplemental Report which contained, *inter-alia*, the following language:

> "Suspect powder was tested by the Vermont State Lab.   Their test showed that suspect powder was not cocaine but corn starch.

> Case closed - unfounded." [Depo Ex. 122; Depo Of Webster, p. 95, ll. 2-22].

147.    The meaning of Webster's February 15, 2005 Supplemental Report was that Webster was closing out the case because there was no evidence of any crime and, indeed, what evidence there was,  was evidence of innocence rather than evidence of guilt [Depo of Webster, p. 95, ll. 14-22].

## N.  THE ARREST OF GREEN WAS BY DECISION AND ORDER OF WEBSTER RATHER THAN BY THE DIRECTIVE OR REQUEST OF SOME OTHER POLICE OFFICER

148.    It was Webster who made the arrest of Green.  [Depo of Webster, p. 51, ll. 6-8]

149.    It was Webster, himself (not some other police officer)  who made the

determination to arrest Green. [Depo of Webster, p. 64, ll. 14-18].  The Arrest Custody Form lists Webster as the "investigating Officer". See Depo. Ex. 112].

150.    the circumstances alleged to be the crime took place in the Town of Stowe, Webster's jurisdiction, rather than within the Town of Morrisville, Christiensen's jurisdiction. e. [See Webster's Affidavit of Probable Cause, Depo Ex. 106, ¶¶ 1, 2 and 7].

151.    It was Webster who made the decision to involve Christiensen in the investigation, rather than vice versa. [Depo of Webster, p. 117, l. 20- p. 118, l. 10.]

152.    After viewing the powder. Webster felt that it might be cocaine but wanted a "second opinion",  meaning that the "first opinion" was his own [Depo of Webster p. 161, ll. 19-22].[Depo of Kaplan, p. 104, l. 11- p. 108, l. 1][ Depo Ex.  131]

153.    Webster was in charge of the search. [Depo of Dougherty, p. 46 ll. 12-13]

154.    Webster was in charge of the arrest [Depo of Dougherty, p. 46 ll. 9-11.]

155.    Webster applied his own judgment to his own observations to reach his own opinion that the field test result was positive for cocaine ["we all agreed the substance field tested positive for cocaine" [See the report of Christiensen, Depo ex 105]

156.    Webster does not dispute that the field test result at the Topnotch was incorrect.  [Webster Depo p. 131, ll. 22-24]

157.    Webster does not dispute that the incorrect result was done with him in charge [Webster Depo p. 131, l. 8 - p. 132, l. 2].

158.    Webster was in charge of the field testing, even though th police officer from Morrisville (Christensen) was there.  Depo of Dougherty, p. 45, l. 24- p. 46 l. 8.

159.    Webster admits that when a field test is done when he is in charge of the scene, it is he that is responsible to see that it is done correctly.  [Depo of Webster, p. 132. ll. 17-20].

160.    Webster admits he is responsible for the fact that the instructions were not followed and for the "screw up" in this case. [Depo of Webster, p. 133. l. 3- p. 134, l. 20].

161.    It was Webster who wrote the report closing out the criminal case. [See Section M, infra, citing  Depo Ex. 122 and  Depo Of Webster, p. 95, ll. 2-22].

## O.    WEBSTERS NEW PROBABLE CAUSE AFFIDAVIT - THE COVER UP BEGINS

162.    On February 18, 2005, three days after creating the report closing the Green case as unfounded, Webster created an affidavit in which he signed and swore under oath that he then  had probable cause  to believe that Green committed the offense of possession of cocaine [Depo Ex 123 and Depo of Webster, p. 89, l. 1- p. 90, l. 5][Also see the admissions in ¶ 114 of the Answer].

163.    As of the date Webster created this affidavit, he  did not personally believe Green possessed Cocaine and knew he had no probable cause but created it because his Chief ordered him to do so  [Depo of Webster p. 90, ll. 10-17; p. 176, ll. 20-p. 177, l. 2; P. 93, ll. 6-11].

164.    Webster admits that he obeyed this order of his chief even though he knew the affidavit  was not true and even though, as a police officer, he  understood that it is perjury to falsely swear under oath that someone committed a crime when you know they didn't [Depo of Webster, p. 92, ll. 4-25].

165.    Chief Kaplan testified that he did not tell Webster to fill out this affidavit by asserting that he had probable cause because that would be untrue [Depo of Kaplan, p. 100, l. 11- p. 101, l. 3].

166.    Asked why he wrote this document so as to swear under oath "saying I do have probable cause", Webster, referring to Kaplan, testified " I did discuss it with him and questioned why he wanted it done that way, and I was told to do it" [Depo of Webster, p. 96, ll. 1-9].

## P.  THE COVER-UP CONTINUES - A MISLEADING FILING WITH THE COURT

167.    The search warrant for that room required that if the  cocaine or drug paraphernalia, personal telephone books or large sums of currency which may have been or will be used in drug transactions were found in TopNotch Hotel room 310, then the police must file an inventory with the court listing those items.  [Admitted by ¶ 115 of the Answer].

168.    Webster acknowledges that if he executes a search warrant he is obligated by law to  fill out and file a return with the court even if he finds nothing in the search [Depo of Webster, p. 30, ll. 15-22].

169.    Webster acknowledges that in the event that, as in the Green case, *nothing* is found pursuant to the search warrant, the return filed with the court should report to the court that nothing was found in execution of the warrant [Depo of Webster, p. 36, l. 25-p. 37, l. 6].

170.    No such inventory was filed with the Court as of the date Webster was deposed in this case. [See Defendant's Answer to Plaintiff's Request To Admit # 40].

171.    Chief Kaplan acknowledges that when his Department got the warrant it had the duty to tell the Court what it found or did not find but that he has never seen any document that performs that duty  [Depo of Kaplan, p. 75, l. 23- p. 76, l. 9].

172.    According to Chief Kaplan, Webster either lost or never created the inventory stating that nothing was found in the search of Room # 310 [Depo of Kaplan, p. 74, ll. 11-24].

173.    At his deposition, Webster brought the Stowe Police Department's entire file in the Green matter but there is no inventory of the February 11, 2005 search of Room # 310 in the that file [Depo of Webster, p. 38, ll. 11-19].

174.    Webster does not dispute that he did not send the States Attorney a copy of the inventory of the search of Room # 310.  [Depo of Webster, p. 44, l. 16- p. 46, l. 1.]

175.    The Court advised Chief Kaplan that it did not have in its file an inventory for the search of Room #310 and asked that one be filed. [Depo of Kaplan, p. 73, ll. 3, - 10 and p. 74, ll. 4- 25].

176.    Webster admits that he was capable of preparing a written inventory of the results of the search conducted to TopNotch Room 310 on February 11, 2005 pursuant to the search warrant he applied for.  [Webster's responses to Requests To Admit ## 39-40].

177.    Webster cannot produce any document in which he told the Court that the powder in question was cornstarch [Depo of Webster, p. 42, ll. 4-7].

178.    The document which was filed instead of an inventory of the results of the search warrant  is entitled  "Stowe Police Department Property and Evidence Report". [Depo Ex. 129][Depo of Webster, p. 39, l. 8-18 and p. 43, ll. 10-22][ Also see the admission in ¶ 116 of the Answer].

179.    This "Evidence Report"  filed with the Court stated " 1 Plastic bag w/paper towel containing White powder substance believed to be cocaine." [Depo Ex 129].

180.    However, the white powder that is referred to in this "evidence Report" filed with the Court  was not found in Room, # 310, the room at which the Search warrant was directed [Depo of Webster, 39, l. 23- p. 40, l. 7].

181.    This  report was not filed with the Court until May 19, 2005, three months after the case was closed. [compare Depo Ex. 122 closing the case on February 15, 2005

and the May 19, 2005 date stamp of the Court filing on the Evidence Report, Depo. Ex. 129][See the admission by ¶ 119 of the Answer].

182.    Moreover, as of May 19th, when this evidence report was filed with the Court, Webster did not believe the powder in the bag referred to in the report was cocaine as he and everybody else in the Stowe Police Department knew that it was cornstarch not cocaine.[Depo of Webster , p. 42, ll. 3-7 and p. 41, ll. 18-p. 42, l. 1].

183.    Webster does not deny that it was he who filed this "evidence report" with the court. He testified that he may have filed it but does not remember doing so. [Depo of Webster, p. 154, l. 1- p 155, l. 12].

184.    Asked why, at a time when Webster knows what was in the plastic bag was cornstarch, that the Court is being told that it's believed to be cocaine, Webster testifies:

**"Because I was apparently ordered to file this with the court"** [Depo of Webster,
    p.41, ll. 1-9]

185.    Asked why he would not have suggested that the truth be told to the Court, Webster testified:

**"I was issued an order apparently by the Chief and I followed the order"** [Depo of Webster, p. 43, ll. 17-22].

186.    Chief Kaplan admits that he ordered that the Evidence Report be filed with the court and that he did so three months after the case was closed. [Kaplan Depo, p. 72, ll. 11-23].

### Q.  THE COVER-UP CONTINUES - A SELF SERVING "REPORT OF INVESTIGATION"

187.    Deposition Exhibit 131 is a "Report of Investigation" by Webster [Depo of Webster p. 156 ll. 10-16].

188.    Webster prepared the report because Chief Kaplan ordered him to, after the Chief had received a call from Pam Green's lawyer [Webster Depo, p. 156, ll. 20-22 and Depo of Kaplan, P.32, ll. 9-11 ].

189.    It was on June 7, 2005, four months after he closed the Green case, when Webster prepared this report [Depo of Webster, p. 156,  ll. 16-19]

190.    Asked whether Chief Kaplan told him what to put in the report it and what not to put in it, Webster testified " He may have told me what he wanted highlighted." [Depo of Webster, p.159, ll. 6-8].

191.    Webster agrees that this "Report of Investigation" is not a complete report of what happened.[Depo of Webster, p. 159, ll.12-14] .

192.    The Report would seem to be incomplete in that it fails to discuss the manner or outcome of Webster's investigation of Ms Green.  For example, Webster admits the following::

192(a).  The Report  doesn't adequately define what was done and not done with respect to that investigation [Depo of Webster, p. 159, ll. 19-22];

192(b).  There is nothing in the report that explains why this case was closed as unfounded [Depo of Webster, p. 158, l. 25- p. 159, l. 2.].

192( c).  One cannot, by reading the report, know whether the suspect is guilty or innocent [Depo of Webster P. 159, ll. 15-18.,

192(d).  Asked where there is anything in this report that suggests that Green was innocent, Webster testifies "This doesn't get to that point of the investigation." [Depo of Webster, p. 158, ll.19 - 24]

193.    The Report would seem to be incomplete in that it fails to discuss any material exculpatory evidence which contributed to the end result.  For example, Webster admits that the Report does not contain any of the following information:

193(a)  Patrolman Dougherty told Webster that the white powder wasn't coke [Depo of Webster, p. 157, ll. 20-22];

193(b)  the Vermont State Lab did a test which proved that the suspect powder was cornstarch [Depo of Webster, p. 158, ll. 10 - 13];

193( c)  the suspect powder tested negative for cocaine in the field test done by Detective Stewart [Depo of Webster, p. 158, ll. 14-18]; and/or

193(d)  That there is not some reason why Webster did not include in the report, the fact that when he was transporting Green to the police department she did not seem guilty [Depo of Webster, p. 161, l. 23- p. 162, l. 2].

194.    The Report would seem to be incomplete in that it fails to discuss any of the inadequacies and problems Webster had in investigating Green.  For example, Webster admits all of the following::

194(a).  It does not report that the  instructions for the Cocaine Field test were not followed when doing the test with the putative positive result [Depo of Webster, p. 158, ll. 3-5];

194(b).  It does not state that Webster is not a drug man and/or that he  can't tell the difference between cocaine and flour? [Depo of Webster, p 157, ll. 15-19];

194( c).  Webster does not know why it does not report that when he looked at this white powder, he thought it might be coke or he thought it might be hash [Webster Depo, p. 162, ll 3-6];

194(d). Although it asserts that after viewing the powder Webster wanted a second opinion [Depo Ex 131],

194(e).  It does not report the undisputed fact that Patrolman Dougherty told Webster that the white powder wasn't coke [Depo of Webster, p. 157, ll. 20-22].

194(f).  Nor does it report that other than doing the field test Patrolman Garth Christiensen didn't give Webster any second opinion as to what this powder was based on its appearance [Depo of Webster, p. 157, l. 23 - p. 158, l. 2].

194(g).  Nor is there any indication in the report that Officer Christiensen even had an opinion, based on the appearance of the powdery substance, as to whether or not it was  cocaine [Depo Ex.131; See also Depo of Webster, p. 119, l. 22- p. 120, l. 1];

195.    The Report is signed by both Webster and Chief Kaplan [Depo of Webster, p. 157, ll. 6-8].

196.    **Webster does not know what function this report served** because:

**"We don't use report of  investigations anymore"** ...[Depo of Webster, p.157 ll. 9-11]

....

**"I guess you would have to ask the Chief because he requested it."** [Depo of Webster, p. 159, ll. 3-5]

### R. SOME OF GREEN'S DAMAGES

197.  Green had never been arrested before  [Admitted by  ¶ 104 of the Answer].

198.    While in police custody at the Stowe Police Department, Webster caused Green to submit to a mug shots and having her finger prints taken [Admitted by  ¶ 105 of the Answer].

199.    Later in the morning of February 11, 2005,  Green was released from the custody of the Stowe Police with a citation ordering her to appear in court in Hyde Park, Vermont for arraignment on a charge of felony possession of cocaine [Depo Ex. 117][

Depo of Webster, p. 84, l. 22- p. 86. l. 5][Also see the admission in ¶ 110 of the Answer]. She returned to her home in Pennsylvania.

200.    It was on February 14, 2005 that the Vermont State Police Laboratory faxed to Stowe Police Chief Kaplan its written report of its testing that confirmed that the white powder was not cocaine but cornstarch [Depo Ex. 121].

201.    On February 22, 2005, eleven days after her arrest, Green first received written notice that she was relieved of the obligation to appear in court in response to the citation Webster issued her. [Depo of Kaplan, p. 43, l. 23 - p. 45, l. 23][also see the admission in ¶ 113 of the Answer that the citation to Green was withdrawn].

202.    Though this Motion for summary judgment does not present the issue of the nature and degree of the damages the arrest proximately caused plaintiff, Defendant's attempt to trivialize them merits some reply.  Plaintiff was in dire fear that this arrest would cost her her new and prestigious job.  She had never been arrested before.  Her arrest took place at the Topnotch Hotel in Stowe.  She was there from Philadelphia attending a conference her employer, the newspaper USA Today, was holding for her supervisors and higher ranking officials in the company.  Although recently hired, the company invited and directed Pam to attend as one of its new rising stars.  But for Pam's post-arrest resort to the aid of her superiors and their resulting invocation of heavy hitting lawyers from Philadelphia, the Defendant's (admitted in his deposition) refusal to investigate her claims of innocence would have prolonged her arrest period.

The particular circumstances of this arrest, in the presence of her colleagues and superiors, was particularly mortifying to Pam.  Now Pam feels apprehension, insecurity and unease when she sees or is in the presence of police.  She now restricts her overnight travel, particularly when it is in predominantly white areas.  The photographs and fingerprints which were taken from her at the time of her arrest have neither been returned to her or otherwise adequately accounted for.  The Defendant has not confirmed that Pam's arrest was not entered into the VCIC or NCIC.[See Depo. of Plaintiff, pp. 44-48, 60-64 and 92-99].

203.    Plaintiff believes the circumstances are such that she would not have been arrested but for conclusions the police jumped to because of the color of her skin.[See Depo. of Plaintiff, pp. 49-50, 52-54.]

## CONCLUSION

This is a case of black and white gone bad.  To the defendant police officer, black skin and white powder equaled coke.   False imaginings lead to a false arrest.  The mistaken interpretation of the first field test result is not, under the circumstances presented here, sufficient to immunize Webster.  Applying the "no reasonably competent police officer would have done this" standard, there are too many "bad facts" for the defendant"  to get summary judgment which would avoid a jury.

Dated at Montpelier, Vermont, November 7th, 2007.

For The Plaintiff
Pamela Green

By: _____

David Putter, Esquire
15 East State Street
Montpelier, Vermont 05602
Tel. (802) 229-0932

cc:   Clerk, USDC, VT
       Joseph Farnham, Esq.
       Pamela Green

\\Newdave\c-dave\Wp50\Green-SJ\Disputed Facts of PL SJ .wpd

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

PAMELA GREEN, Plaintiff                          :

         v.                                   :          Civil Action
                            :          Case No.   1:06-cv-96
TOPNOTCH AT STOWE, et al, Defendants             :

### CERTIFICATE OF SERVICE

I, David Putter, Esq., Attorney for Plaintiff, hereby certify that on November 7, 2007, I

caused to be served upon the Defendant Webster the following:

**PLAINTIFF'S STATEMENT OF MATERIAL FACT  OPPOSING
THE STATEMENT PROFFERED BY DEFENDANT AND OPPOSING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(THE SUPPORTING DOCUMENTATION IS IN A SEPARATE COMPENDIUM)**


**A SEPARATE COMPENDIUM: "DOCUMENTS SUPPORTING PLAINTIFFS
STATEMENT OF MATERIAL FACT OPPOSING THE STATEMENT
PROFFERED BY DEFENDANT AND OPPOSING DEFENDANT'S MOTION
FOR SUMMARY"**

**PLAINTIFF'S MEMORANDUM OF LAW OPPOSING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

By mailing copies of the same via First Class Mail, Postage Prepaid, to the Defendant's

Counsel of  Record at the following addresses:

    **Joseph Farnham, Esquire
    McNeil, Leddy & Sheahan, PC
    271 South Union Street, Burlington, Vermont 05401**
    (For Defendant Webster).

    Dated at Montpelier, November 7, 2007.

                                      Attorney for Plaintiff
                                      David Putter
                                      15 East State Street
                                      Montpelier, VT 05602
                                      (802)229-0932

cc:    Clerk, USDC, Burlington
        Joseph Farnham, Esq.
        Pamela Green